**In re J. ANTHONY G., a juvenile.**

**Misc. No. 88–48.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 20, 1988.

Paula Lopossa, Asst. U.S. Atty., S.D. of Indiana, Indianapolis, Ind., for plaintiff.

Mark Alderfer, Indianapolis, Ind., for defendant.

TINDER, District Judge.

## ENTRY

This matter comes before the court for a determination of the government's motion to transfer jurisdiction of prosecution of J. Anthony G. to adult prosecution under the provisions of Title 18 U.S.C. § 5032. A hearing was held on April 8, and 11, 1988. The juvenile attended this hearing with his counsel, his parents and grandparents, along with other members of his family. Testimony was presented by both the government and by the juvenile. The hearing was open to the public, but to protect the identity of the juvenile only his last initial and the last initial of the names of the members of his family were used.

At the conclusion of the hearing, I reserved my ruling and took the matter under advisement. In addition to desiring to have time to consider this most serious decision, I hoped that taking the matter under advisement would give Anthony the opportunity to finish the school year and demonstrate his responsibility by conducting himself in an appropriate manner while released pending this decision. The school year has now been completed, and this matter is now ripe for determination.

I am also considering evidence heard at a hearing on compliance with the conditions of his release held on July 18, 1988.

The question before me is whether Anthony should be treated as a juvenile under the Juvenile Justice Act, 18 U.S.C. § 5031 et seq., or whether he should be transferred to handling as an adult under 18 U.S.C. § 5032. The preliminary decision of whether to treat Anthony as a juvenile or an adult is critical and requires particularity in the findings and conclusions that are relevant to this determination. I will discuss the evidence considered and the findings made. I will first address briefly the issue of jurisdiction and then will review the factors required by law to be considered in connection with this proceeding.

## I. JURISDICTION

■ The juvenile, through his counsel, did not seriously question the jurisdiction of this court over Anthony or the offense alleged to have been committed by him. The attempted robbery at issue in this proceeding unquestionably took place on the grounds of a federal reservation, namely Fort Benjamin Harrison, which this court can judicially notice is within the exclusive jurisdiction of federal law. However, through cross examination and in argument, counsel for the juvenile did point out that it is possible that certain portions of the criminal activity may have taken place on property outside of Fort Harrison, over which state juvenile authorities could have jurisdiction. While this may be true, this certainly does not defeat the jurisdiction of

**762**

this court over the conduct which did occur on Fort Harrison. Moreover, it was unclear from the evidence presented where all of the details of the criminal activity took place. It appeared that Anthony and his companion began following the pizza delivery man from a location on state jurisdiction property to the federal reservation. The actual conduct of the attempted robbery occurred at the federal reservation, including the firing of four shots from the firearm. Following escape from capture, Anthony and his companion may have disposed of the weapon used after having left the federal reservation. Nevertheless, it was not clear from the evidence presented, especially Anthony's testimony, whether planning for this crime took place before entering the federal reservation and if any substantive steps toward the commission of the felony occurred prior to the conduct at Fort Harrison.

Even if some parts of the crime or other crimes occurred outside the federal reservation, this court still has jurisdiction over this matter under the provisions of 18 U.S.C. §§ 7, 5032.

## II. STANDARD FOR GOVERNING TRANSFER: "THE INTEREST OF JUSTICE"

The standard by which I must determine whether Anthony's proceedings should be transferred or not is perhaps one of the broadest in our legal system. According to 18 U.S.C. § 5032, I am to assess "whether a transfer would be in the interest of justice." A number of courts have noted that this broad standard is based in part on a rehabilitative philosophy and in part on concern about the serious problem posed by juvenile crime. A number of courts have discussed the language of the statute and the congressional history. *See e.g. United States v. E.K.*, 471 F.Supp. 924 (D.Or.1979); *U.S. v. J.D.*, 525 F.Supp. 101 (S.D.N.Y. 1981). In *U.S. v. E.K.*, Judge James M. Burns recognized that the Federal Juvenile Justice Act starts with an inherent bias toward rehabilitation and a preference that the juvenile system be utilized wherever possible. Judge Burns phrased his approach in this manner:

It is incumbent upon the court to deny a motion to transfer where all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facilities during the period of his minority.

471 F.Supp. at 932.

18 U.S.C. § 5032 sets forth a series of factors which must be considered to arrive at the conclusion of whether the interest of justice is best served by transfer or retention of the matter as a juvenile proceeding. I will attempt to discuss each of these factors and relate them to the evidence heard.

### A. *Age of the Juvenile*

J. Anthony G. is now eighteen (18) years of age, his date of birth being May 25, 1970. The offense occurred on February 23, 1988, when Anthony was barely three months short of his 18th birthday. His companion on the night of the alleged offense was over the age of 18 and is being prosecuted as an adult.

Anthony's age is not the most significant factor in this consideration. Protective and rehabilitative philosophies support the concept of treating juvenile offenders between the ages of 16 and 18 differently than those over the age of 18 who commit federal crimes. The benefit of such treatment tends to diminish as the age of the offender increases. Certainly, the closer an offender is to the age of 18, the less period of time will be available for rehabilitative techniques to be put into effect.

### B. *Social Background*

Anthony is the product of a reasonably stable home environment. As previously indicated, both of his parents attended the hearing in this matter with all of his grandparents. His grandparents and his parents are all hardworking citizens. There are substantial religious influences in his life. His mother is a devout practioner of her faith. One of his grandfathers is a minister. All of the members of his family testified that they stay in close touch with Anthony and that they all have a good ongoing relationship with him.

Anthony's parents have both married new spouses. Anthony spent most of his formative years living with his mother and approximately six months ago left to live with his father upon his mother's new marriage. Even while living with his mother, Anthony stayed in close contact with his father. Neither the parents nor the grandparents indicated that they had ever had any disciplinary problems with Anthony.

However, the evidence indicated that Anthony's family, while quite interested in his well being, failed to carefully monitor his school progress and his out of school activities. Anthony has just completed his fourth year of high school and has accumulated essentially twelve credits toward graduation requirements of over thirty necessary credits. For several continuous years he has received essentially nothing but F"s in school. Nonetheless, his mother believed that he was progressing in school and assumed that since he brought books home from school that he was studying. She only recalled having seen one report card from his high school years which showed relatively low grades. She asked Anthony about it and was satisfied with his assurances that he was bringing his grades up. However, the evidence clearly showed that his grades could be described, at best, as consistently horrible.

Anthony's family did not indicate that they suffer from extreme financial distress. It appeared that all of his grandparents and parents are hardworking individuals. His father, for example, works at two separate jobs. Both his parents and grandparents indicated that whenever Anthony needed money, they would provide it to him. Often he was required to perform various chores for which he would be compensated.

His family indicated that Anthony was open with them, and that he freely discussed matters with them from time to time. Each member of his family who testified indicated that they felt Anthony was a bright and capable young man, and that he realized the wrongfulness of his conduct. They also each indicated that

they were quite surprised by his conduct in this matter.

### C. *Nature of the Alleged Offense*

As previously indicated the alleged offense here is extremely serious. I discussed this in some detail in my order of detention dated April 11, 1988. Of course, for purposes of this proceeding I may presume that the offense as alleged occurred. *In re: TW*, 652 F.Supp. 1440, (E.D.Wis. 1987). Even without the presumption, it would be a fair determination from the evidence presented at the hearing that Anthony participated in an attempted armed robbery of a pizza delivery man at Fort Harrison on February 23, 1988. Anthony testified at the hearing and admitted his participation.

Prior to the attempted robbery, Anthony had obtained a handgun which belonged to his stepmother. He removed the bullets from the handgun before taking it out of his father's house. His companion was able to obtain other bullets for the weapon. From this conduct, I infer that Anthony expected that he might have to use the weapon during his activities of that evening and wanted to prevent his stepmother from knowing that he had used it.

During the course of the attempted robbery, Anthony was the primary actor of his two-man robbery team. He carried the handgun and physically confronted the pizza delivery man. He had his weapon drawn during the confrontation, and fired a total of four shots. The first two shots were fired at the scene of the attempted robbery and the last two shots were fired while Anthony and his companion were attempting to escape the robbery scene. The pizza delivery man heroically attempted to follow the would-be bandits, and during the course of this chase Anthony leaned out of the passenger side of the car and fired off the two additional rounds.

During the course of the events, at least one of the bullets fired from the gun came within a few inches of striking the pizza delivery man. His automobile was damaged by this bullet. It struck the frame of the window on the driver's side of the car, just a few inches from where the head of

the driver is located. If the bullet had not struck the frame of the window, it very well might have hit the pizza delivery man.

Anthony was arrested several days later and admitted his participation in the offense only after coaxing from his father.

### D. Extent and Nature of Juvenile's Prior Delinquency Record

The evidence indicated that Anthony has no prior juvenile record whatsoever. There is no indication that he has ever been arrested for anything other than this offense.

### E. Juvenile's Present Intellectual Development and Psychological Maturity

At the request of counsel for the juvenile, the court authorized an examination of Anthony by a phsychologist. His report was introduced into evidence at the hearing. The psychologist's report indicates that Anthony is of relatively average maturity for his age. His intellectual development seems to be somewhat lower than would be expected for a young man of his age. Upon the introduction of his school records, the reason for this somewhat diminished intellectual development was apparent.

Anthony's school attendance in the two years preceding this incident was abysmal. He has numerous unexcused absences and received virtually straight F's during that time period. Testing measurements of his intelligence in the school system and by the psychologist indicate that Anthony has the capability of learning, but his records show that he has put forth virtually no effort at school for a significant time period. Overall, it appears that Anthony is of average psychological maturity, at least with respect to his peers and his relationships with his family. However, his intellectual development is limited which appears to be the result of his own lack of interest in school. His home life and educational opportunities appear to have been adequate for a normal intellectual development. Likewise, his intellectual capability appears to give him the potential to achieve in school at least at the average level. He was a very articulate and alert witness on the stand. He also wrote an essay for Mr. Ira Carr, the probation officer supervising his pretrial release. His essay indicates that he is capable of reasoning at the maturity level that one would expect of an 18 year old.

### F. The Nature of Past Treatment Efforts and the Juvenile's Response to Such Efforts

Since Anthony has never been arrested, there have been no previous efforts to treat him for his maladjustment to society's demands. To some degree, the educational process could be considered analagous to an effort at "treatment." Despite the availability of educational opportunities, Anthony has totally rejected anything that the school system has to offer him.

During his release on this matter, efforts were made by the Magistrate and by me to keep Anthony involved in school activities and in close contact with his family and the probation department. As reflected in my April 11, entry on the order of detention Anthony violated the original conditions upon which he was released by Magistrate Kennard P. Foster. He continued to cut classes after Magistrate Foster had ordered him not to, and was involved in a dispute with a teacher which included Anthony's use of extremely vulgar language. After I made his release conditions more stringent, in part by requiring him to stay in daily telephone contact with Mr. Carr from the probation department, Anthony failed to make one of the first telephone calls that he was expected to make. He was then incarcerated for five days, after which he was released under even more stringent conditions than before as reflected in my entry of April 15, 1988. However, it is apparent that he has violated those conditions also. He failed to provide drug tests on May 8, and 12, failed the May 16, test and then missed the May 24, test. Even after being advised of that failure, Anthony was found by his father to be in possession of marijuana approximately a month later. He then failed to provide urine samples on two consecutive dates. His unexcused school absences continued even after he switched his school enrollment for the summer session.

Anthony's explanations for the drug test failure and the possession of marijuana

were not credible, and were not even believed by his father.

While the program outlined in the conditions of his release could not be considered a sophisticated method of treatment of Anthony during the pendency of this action, it is some indication that his response to that type of program while in the general population is not good. Anthony appears to obey the rules that he chooses to obey and disregard the others. He did not fail completely at compliance, and even made some progress in school. However, his lapses were significant and frequent.

While generally I would find this factor to be a neutral one since there have been no past formal efforts at treatment in a juvenile justice system, Anthony's performance while released pending this matter lead me to believe that anything short of a very structured treatment would be ineffective with Anthony. This is especially true when one considers his lack of effort in the school setting.

### G. *The Availability of Programs Designed to Treat the Juvenile's Behavioral Problems*

Mr. Frank Hall, Chief Probation Officer for the Southern District of Indiana, testified at length at the hearing. Mr. Hall indicated that there are no juvenile facilities for incarceration in the federal system. When incarceration is required for a juvenile, the Bureau of Prisons contracts with non-federal facilities. The nearest facility of this type which would be available is called the Lincoln Hills School in Irma, Wisconsin.

The programs at Irma are focused on juveniles from the ages of 14 to 19. It is a relatively secure facility which attempts to direct programs to the needs of the individual juveniles.

The juveniles enrolled in the programs at the Lincoln Hills School are primarily repeat offenders, most of whom have been involved in serious crimes.

Mr. Hall indicated that he believed that Anthony would be better off if he is to be incarcerated, that he be treated as an adult rather than a juvenile. He based his opinion on the following factors:

1. Anthony was nearly 18 years of age at the time of the hearing. By entering a program such as Lincoln Hills at the age of 18 he would be well behind his peers and not likely to be able to get advantage of the types of programs that could be offered there.

2. Anthony's physical stature would make him larger than most of the other participants in the program at Lincoln Hills, thus subject to harassment.

3. The offenses of most of the participants at Lincoln Hills would be quite serious and violent crimes.

4. The programs offered at Lincoln Hills did not have much to offer in the way of vocational background.

5. Most of the participants at Lincoln Hills School have much longer and more extensive records than Anthony. Consequently being exposed to many repeat offenders would be a negative environment for Anthony.

6. The ability to obtain a continued education is much greater in an adult facility such as the Federal Correctional Institute at Sandstone. Lincoln Hills would have a great deal of difficulty in providing Anthony an educational program that would allow him to progress in school in the short period of time in which they would have him. Likewise, the educational offerings are not nearly as extensive as they would be in an adult facility.

Mr. Hall indicated that he thought that Anthony would be likely to serve more time as a juvenile than he would as an adult under the sentencing guidelines.

### III. CONCLUSION

It is no easy decision to chart the course of this 18 year old young man. Unfortunately, the Juvenile Justice Act gives no guidance on how to weigh the factors. *United States v. J.D.*, 525 F.Supp. 101 at 104, (S.D.N.Y.1981). Nonetheless, consideration of the foregoing factors lead me to conclude that the transfer should be granted and that he should be prosecuted as an

adult. The evidence presented at the hearing shows that Anthony is an aggressive and violent individual when he is away from his homelife. His family, while extremely well intentioned, has been blind toward some serious developments in Anthony's life. He has been involved in drug use and school is nothing more than a gathering place to associate with the crowd with which he chooses to run. Anthony and his associates spend an inordinate amount of time "cruising" aimlessly when cutting classes.

Efforts at rehabilitating Anthony as a juvenile would be futile. He has the physical stature of a mature young man and has proven his capability to be dangerous and violent.

The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, Anthony does not present a profile which I believe could be rehabilitated before reaching the age of 21.

While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder. Anthony testified that the shots fired from the car during the attempted escape were just to "scare" the pizza delivery man, but it's a fine line between scaring someone with a firearm and killing them when it is being shot out the window of a moving vehicle. This also says nothing about the danger it poses to bystanders.

Perhaps second most important in my determination was Anthony's inability to comply with the conditions of his release. While this is technically not one of the factors as such, I do think it reflects on whether or not rehabilitation of a juvenile type would work with Anthony. He shows a dangerous interest in illegal drugs and it could be inferred that his participation in this attempted robbery was to obtain money for which to buy drugs so that his family would not know about that part of his life either.

None of the other factors indicate much hope for rehabilitation of Anthony in the juvenile setting. The interest of justice would be best served by treatment of him as an adult.

Therefore, I conclude that the government's motion should be GRANTED and that a transfer of Anthony's proceeding be permitted so that he may be prosecuted as an adult.

Under the provisions of 18 U.S.C. § 5036, an alleged delinquent must be brought to trial within thirty (30) days of the commencement of detention. Prior to July 18, 1988, J. Anthony G. had been detained a total of seven (7) days. He was again detained on that date and the speedy trial clock begins to run again.

However, since I have determined that he is not to be treated as a juvenile, the provisions of the regular Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, will now apply. Since no formal charges have been filed as of this date, pursuant to 18 U.S.C. § 3161(c)(1), no time has elapsed under this act.

■ If 18 U.S.C. § 3161 *et seq.* were applicable to this matter from the time of J. Anthony G's arrest, I find that all of the time prior to July 18, 1988, elapsed to this point except for the seven days Anthony was incarcerated should be excluded from any speedy trial computation. These exclusions are in part because of delay attributed to defense counsel's request for psychological evaluation and in part for time attributable to my own motion for continuance to give detailed consideration to this matter. Therefore, all such delays served toward the ends of justice, and outweighed any interest the public and/or Anthony had in a speedier disposition of this matter. Therefore, these periods would be excluded

from computation pursuant to 18 U.S.C. § 3161(h)(8)(A), if applicable.