**UNITED STATES of America,**

v.

**JUVENILE MALE, Defendant.**

**No. 10–CR–519 (JFB).**

United States District Court,
E.D. New York.

Feb. 2, 2011.

John Joseph Durham, United States Attorneys Office, Central Islip, NY, for United States of America.

Terrence P. Buckley, Terrence P. Buckley, Esq., Commack, NY, for Defendant.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

On July 6, 2010, the government filed a Juvenile Information ("Information") against defendant Juvenile Male ("the defendant") charging him with two counts of attempted murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); two counts of assault with a dangerous weapon in aid of racketeering, 18 U.S.C. § 1959(a)(3); and two counts of discharging a firearm in connection with a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii). The government subsequently moved, pursuant to 18 U.S.C.

§ 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On January 20, 2011, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[1] This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the government's motion to transfer to adult status is granted. In other words, based upon the record and after carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted in the interest of justice.

## I. THE CHARGES[2]

The charges against the defendant stem from the government's continuing investigation into the activities of the violent street gang La Mara Salvatrucha ("MS–13"). (Gov't Mem. of Law at 2.) Since approximately 1998, members of MS–13 on Long Island are alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS–13 and rival gang members, as well as their families and innocent bystanders. (Id.) In addition to targeting rival gang members, MS–13 members have engaged in violent attacks on individuals whom they mistakenly believe are in a rival gang and on individuals whom they believe are cooperating with law enforcement. (Id. at 2–3.) Twenty-two defendants allegedly associated with MS–13 have been charged with various crimes in a 42–count superseding indictment unsealed on July 30, 2010 in United States v. Prado, No. 10–cr074 (JFB).

As set forth in the government's transfer motion, MS–13 members agree at the time of their induction into the gang to kill "chavalas," or members of rival gangs, whenever possible. (Id. at 4.) In this case, the defendant has been charged in connection with two attempted murders of rival gang members, one involving an alleged member of the 18th Street Gang and another involving an alleged member of the Salvadorans With Pride ("SWP") Gang. Specifically, the first attempted murder allegedly occurred on June 6, 2009, at approximately 7:30 p.m. (Id. at 5.) At that time, the victim, identified in the government's papers as "John Doe # 1," was standing in front of a Golden Crust store on Ann Street in Hempstead, New York. (Id.) John Doe # 1 had tattoos on his arms of a "1" and an "8," which were indicative of membership in the 18th Street Gang. (Id.) While John Doe # 1 was standing outside of the store, the defendant allegedly approached him and shot him four times in the chest. (Id.) Although John Doe # 1

1. Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. See 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

2. The allegations set forth herein were drawn from the information presented at the January 20, 2011 hearing and from the government's motion papers and supporting documentation. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." United States v. Nelson, 68 F.3d 583, 589 (2d Cir.1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

was treated for life-threatening injuries and remained in a coma for one month, he ultimately survived the shooting. (*Id.* at 5–6.)

As charged by the government, the second attempted murder occurred approximately one month later, on July 1, 2009. (*Id.* at 6.) On that date, at approximately 6:00 p.m., an individual identified as "John Doe # 2" was sitting in the driver's seat of a 2007 Nissan Sentra ("the Sentra") on Wellington Street in Hempstead, New York. (*Id.*) John Doe # 2, who has been identified as a member of SWP, allegedly observed the defendant sitting in the driver's seat of a Nissan Maxima ("the Maxima") that was parked adjacent to the Sentra. (*Id.*) While the defendant waited in the Maxima, another male allegedly exited the passenger side of the Maxima, armed with a handgun, approached the Sentra, and fired approximately five shots from several feet away from John Doe # 2's window. (*Id.*) The shooter allegedly then got back into the Maxima, and the defendant drove away. John Doe # 2, who survived the attack, was shot once in the elbow. (*Id.*)

The defendant was arrested the following day, on July 2, 2009, by members of the Nassau County Police Department and initially was charged in Nassau County Court in connection with the shootings. (*Id.* at 7–8.) Subsequently, on May 7, 2010, United States Magistrate Judge Arlene Lindsay signed an arrest warrant for the defendant and he was charged federally, first by complaint and then pursuant to the Juvenile Information. (*Id.* at 8.) [3]

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

■ "A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir.1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[4] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4)

---

3. The government also provided information based upon the defendant's inculpatory post-arrest statements. (*See* Gov't Mem. of Law at 7–9.) Although the defendant has not formally moved to suppress the statements, he did express to the psychologist who evaluated him that his statements were coerced. (*See* Forensic Psychological Evaluation by Dr. L. Thomas Kucharski at 2.) However, the Court need not address the voluntariness of the defendant's statements because the Court does not intend to rely upon these statements in any way in connection with this motion. In other words, even without the defendant's statements, the Court finds, for the reasons set forth herein, that the government has clearly met its burden in demonstrating that transfer is appropriate in this case.

4. In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that ... the offense charged is a crime of violence that is a felony ... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law Ex. 3.)

the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032; *Nelson I,* 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See Nelson I,* 68 F.3d at 588; *United States v. John Doe # 3,* 113 F.Supp.2d 604, 605 (S.D.N.Y.2000).

■■■■ Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I,* 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez,* 297 F.3d 185, 193 (2d Cir.2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision ... [and] clearly is one of the primary purposes of the juvenile delin-

quency provisions." *United States v. Nelson,* 90 F.3d 636, 640 (2d Cir.1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I,* 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance [between] .... affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II,* 90 F.3d at 640 (citations and alterations omitted).[5]

### III. ANALYSIS OF FACTORS

#### A. Juvenile's Age and Social Background

■■■■ The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I,* 68 F.3d at 589 (finding that district court

---

**5.** Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and

(3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male # 1,* 47 F.3d 68, 69 (2d Cir.1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra.*

erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir.2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *United States v. A.R.*, 203 F.3d 955, 961 (6th Cir.2000) ("[T]he [district] court's noting A.R.'s advanced age was consistent with this Court's and other courts' conclusions that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult." (collecting cases)).

▌ In this case, the defendant, born on December 12, 1991 (Gov't Ex.[6] 1, 13), was approximately seventeen years, six months old at the time of the alleged attempted murders and nineteen years, one month old at the time of the hearing.[7] As noted by Dr. L. Thomas Kucharski ("Dr. Kucharski"), the psychologist retained by defense counsel to evaluate the defendant, because the defendant "is currently 19 years of age ... [he] would have very limited time in juvenile custody where his criminalistic thinking and propensity for violence could be addressed." (Forensic Psychological Evaluation by Dr. L. Thomas Kucharski ("Kucharski Report") at 4.) Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of nineteen, which would allow him only five years[8] in a juvenile detention facility to rehabilitate himself, and the fact that he was nearly eighteen years old, and therefore was almost an adult, at the time of the alleged murders, both weigh strongly in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citation omitted)); *United States v. Doe*, 49 F.3d 859, 867 (2d Cir.1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either

---

6. "Gov't Ex." refers to the government's exhibits that were admitted into evidence at the December 21, 2010 transfer hearing.

7. Although the government has not provided the Court with a copy of the defendant's birth certificate, the defendant does not dispute that the date of birth he provided to law enforcement officials was accurate. The psychologist's evaluation of the defendant also noted that he is currently nineteen years old. (*See* Forensic Psychological Evaluation by Dr. L. Thomas Kucharski at 1.)

8. *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend in the case of a juvenile who is between eighteen and twenty-one years old who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of five years or the maximum of the guideline range.")

when he was very young or as an isolated indiscretion"); *United States v. H.V.T.*, No. 96–cr–244 (RSP)(GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer.").

The Court also finds that the defendant's social background weighs in favor of transfer. According to the information self-reported by the defendant to Dr. Kucharski, the defendant was born in El Salvador to a working class family. Although the defendant's father passed away when the defendant was six years old, the defendant reported that "his family life was normal and that 'everything was good.'" (Kucharski Report at 2.) The defendant denied a history of physical or sexual abuse and stated that he was not a witness to significant violence during his childhood. (*Id.*) Nevertheless, despite his apparently stable family life, the defendant was incarcerated in El Salvador at age twelve for shooting a man in the foot who allegedly was trying to steal the defendant's cell phone. (*Id.*) The defendant spent approximately eleven months in a juvenile detention facility for this offense. (*Id.*) At the age of thirteen, the defendant came to the United States, and when he was fourteen, he moved to Long Island, New York. (*Id.*) As the defendant candidly admitted in his interview with Dr. Kucharski, soon after his arrival in New York, the defendant became involved with the local MS–13 gang.[9] (*Id.*) The defendant's membership in the gang allegedly persists to this day, and the government argues that these allegations are corroborated in part by the MS–13 paraphernalia that corrections officers have seized from him during his incarceration pending the outcome of the charges in this case (as well as by the defendant's tattoos). (*See* Gov't Mem. of Law at 9; Gov't Ex. 1, 2.) The defendant did not report attending any school since his arrival in the United States approximately six years ago.

Accordingly, although there is no indication that the defendant's family condoned or accepted criminal activity, the defendant nevertheless rejected his normal home life, and instead chose to come to the United States and allegedly joined a gang. Although the defendant stated that he would try to "stay away from gangs" if he were prosecuted as a juvenile, there is no indication in the record that he would be able to do so. To the contrary, defense expert Dr. Kucharski reported that the defendant "presents with a significant history of antisocial behaviour" and "appears to harbor a mind set that is criminalistic in nature." (Kucharski Report at 4.) Given that the defendant has "no insight into his criminal conduct," (*id.*), the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged. Accordingly, the Court finds that the defendant's age and his social background, in conjunction, weigh strongly in favor of transfer. *See Doe*, 49 F.3d at 867 ("As to Doe's social background, the court noted that when Doe emigrated to the United States, his mother had stayed in Vietnam. Prior to the time of the offenses charged in the present prosecution, Doe's father had

---

**9.** The defendant provided conflicting information to Dr. Kucharski regarding whether he joined MS–13 while he was still living in El Salvador. (*See* Kucharski Report at 2.) However, the Court need not resolve this conflict, because even assuming that he did not join MS–13 until his arrival in New York when he was approximately fourteen years old (which the defendant conceded to Dr. Kucharski), it is clear that he joined the gang at a young age and allegedly has continued his membership to this date.

filed a petition in family court for judicial supervision of Doe. And by the time of the offenses charged in the present case, Doe was completely estranged from his father, preferring the violent BTK gang over his biological family. . . . [T]he court concluded that '[o]n balance, in view of [Doe's] long association with the Born to Kill, it seems that the social background that he lived in at that time was one that would be a factor weighing in favor of a transfer.' "); *H.V.T.*, 1997 WL 610767, at *4 ("It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home. . . . It also appears that H.V.T. became a member of a gang. He wears a tattoo containing a dragon and the letters [of his gang]. . . . H.V.T. has been for some time completely estranged from his aunt in Florida who took him in following his prior conviction, and his brother indicates that he has had no contact with H.V.T. and would be unable to take care of him. I find that H.V.T.'s social background favors transfer."); *cf. Juvenile Male*, 554 F.3d at 468–69 ("In analyzing the first factor. . . . we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer. With respect to [the defendant's] social background, the record is mixed. The district court found that [the defendant] had been raised in 'a loving and intact family,' and saw nothing in his 'social background that would suggest to [him] that gang activity was acceptable behavior.' In contrast to his family situation, however, [the defendant's] life outside the home was not stable. He joined MS–13 around the age of fourteen, and dropped out of school during the ninth grade when his grades and behavior deteriorated. [The defendant] began abusing alcohol at the age of fifteen or sixteen and started using cocaine and marijuana shortly thereafter. Such behavior indicates a lack of structure and support, and accordingly weighs against his transfer. In these circumstances, the district court did not clearly err in concluding that [the defendant's] social background 'minimally' favored his transfer to adult prosecution.").

## B. Nature of the Offense Alleged

■ As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe # 1*, 74 F.Supp.2d 310, 317 n. 6 (S.D.N.Y.1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Information are extremely serious crimes. In the first instance, the defendant is accused of walking up to John Doe # 1 and shooting him four times in the chest. The defendant's sole motivation for this crime allegedly is that John Doe # 1 was the member of a rival gang. The defendant is also charged with being the getaway car driver for a gang-related shooting allegedly perpetrated by a fellow MS–13 member only one month after the shooting of John Doe # 1.

■ The defendant's alleged brazen and violent crimes, which resulted in injuries to the victims—and which were both allegedly committed in public in the early evening hours when innocent bystanders also could easily have been harmed and were both committed as part of the defendant's participation in the violent racketeering activity of the MS–13 gang—are undoubtedly the type of serious charges that weigh strongly in favor of transfer to adult status. Moreover, the Court finds that this factor also should be afforded more weight than any of the other factors.

320

*See Nelson I,* 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than· the other statutory factors."). Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as the crimes alleged here. *See United States v. One Juvenile Male,* 40 F.3d 841, 846 (6th Cir.1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.,* 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer,* 729 F.2d 10, 18 (1st Cir.1984) ("In light of

the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe # 1,* 74 F.Supp.2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.,* 690 F.Supp. 760, 766 (S.D.Ind.1988) ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder.").

### C. Nature and Extent of Any Prior Delinquency Record [10]

██ The criminal history reports run for the defendant reveal that he has no

10. Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson,* 149 F.3d 610, 613 (7th Cir.1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO,* 160 F.3d 1179, 1183 (8th Cir.1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.,* 172 F.3d 1249, 1253–54 (10th Cir.1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district

court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.,* 203 F.3d at 962 n. 2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe # 1,* 74 F.Supp.2d at 316 n. 5

prior convictions. (*See* Gov't Ex. 6.) Moreover, the government has not produced any court records indicating that the defendant has a prior delinquency record.[11] Accordingly, the Court finds that this factor weighs against transfer. However, the Court notes that an absence of a prior delinquency record is not dispositive in a transfer determination and does not preclude the transfer of a defendant to adult status when, as in the instant case, a balancing of all the statutory factors (including this one) weigh in favor of transfer. *See, e.g., Juvenile Male,* 554 F.3d at 468–70 (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the

defendant's age and social background); *J. Anthony G.,* 690 F.Supp. at 764–65 (granting government's transfer motion despite defendant's lack of a prior juvenile record).

### D. Juvenile's Present Psychological Maturity and Intellectual Development

As noted *supra,* the defendant was evaluated by a licensed psychologist, Dr. L. Thomas Kucharski. Although defense counsel provided the Court with a copy of Dr. Kucharski's report, the defense did not call Dr. Kucharski as a witness at the hearing; instead, the defendant submitted the report as defendant's opposition to the transfer motion, and the government also introduced the report as part of its own exhibits. For the reasons set forth *infra,*

(noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor"). *But see In re Sealed Case,* 893 F.2d 363, 369 n. 12 (D.C.Cir.1990) (stating that a "juvenile's alleged violations of law" are "entirely unrelated" to other factors in the transfer analysis). In any event, this Court need not resolve this question because the Court is not considering any conduct that relates solely to an arrest. In fact, as noted *supra,* the defendant has no prior arrests in the United States, and the Court is not considering any arrests in El Salvador.

11. Section 5032 states that "[a] juvenile shall not be transferred to adult prosecution ... until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record...." 18 U.S.C. § 5032. The Second Circuit has recognized, in relation to a prior version of § 5032 that required such records be produced before commencement of juvenile proceedings, that "[w]hile the language of the record certification provision of § 5032 is amenable to strict interpretation ... most courts have read the records certification provision to require only good faith efforts by the government to provide the court with documentation of a juvenile prior record (or to the effect that no such record exists or is avail-

able)." *United States v. Wong,* 40 F.3d 1347, 1369 (2d Cir.1994). In this case, it is undisputed that the defendant has no prior criminal record in the United States, and, as such, the Court finds that the criminal history reports submitted to the Court, which reflect the defendant's complete lack of criminal history, demonstrate the government's good faith efforts to comply with the terms of § 5032. However, in connection with this factor, the government also has attempted to rely upon the defendant's post-arrest statement that he had been arrested and convicted in El Salvador when he was twelve years old for shooting an individual in the foot during a dispute over a cell phone. As already noted *supra,* however, the Court is not relying upon the defendant's post-arrest statements in any manner in relation to its transfer analysis, and the government has not produced any independent records verifying the defendant's report of his conviction in El Salvador. Therefore, the Court will not consider the defendant's post-arrest statements regarding his purported prior conviction in El Salvador and, thus, finds that this factor weighs against transfer. However, as noted *infra,* the Court can and will consider the defendant's statements to defense expert Dr. Kucharski regarding the defendant's violent conduct in El Salvador.

the Court finds that the defendant's intellectual development and psychological maturity, as discussed in Dr. Kucharski's report, weigh strongly in favor of transfer.

As an initial matter, Dr. Kucharski reported that the defendant: (1) exhibited "no evidence of significant cognitive impairment," (2) presented "in the normal range of intellectual functioning by estimate," and (3) appeared to be "psychologically devoid of any significant deficits in maturity." (Kucharski Report at 3.) Although, as highlighted by defense counsel, Dr. Kucharski noted that the defendant's "insight and judgment appear limited," Dr. Kucharski nonetheless found that the defendant's thoughts were "logical, rational, and coherent" and his "attention, memory, and concentration were within normal limits." (Id.) Thus, it is clear from the report that the defendant possesses sufficient intellectual capacity and psychological maturity to, if he so chose, conform his conduct to the law and to appreciate the gravity of the charges he is facing.

Furthermore, of great concern to the Court are Dr. Kucharski's findings that the defendant "presents with a significant history of antisocial behaviour" and "appears to harbor a mind set that is criminalistic in nature." (Id. at 4.) For example, Dr. Kucharski reported that the defendant stated "in a rather nonchalant manner" that, when he was twelve years old, he had shot a man in the foot after the man allegedly tried to steal the defendant's cell phone. (Id.) In addition, Dr. Kucharski noted that the defendant "has no insight into his criminal conduct," and "was unable to identify any significant psychological deficits or psychological difficulties that would be the focus of treatment." (Id.) Consequently, Dr. Kucharski concluded as follows:

It is the clinical impression of this evaluator that there is very little evidence that [the defendant], if placed within the juvenile justice system, would benefit from rehabilitation efforts. He is currently 19 years of age and would have very limited time in juvenile custody where his criminalistic thinking and propensity for violence could be addressed.... It is unlikely that during the period of time that would be available if he were placed in the juvenile system that significant changes in his behavior and criminalistic beliefs would occur given the quality of interventions currently in evidence within most juvenile justice systems and the limited time available to address his difficulties.

(Id.) Accordingly, the Court finds that the defendant's intellectual development and psychological maturity both weigh strongly in favor of transfer. See A.R., 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); H.V.T., 1997 WL 610767, at *5 ("Both psychologists testified that H.V.T.'s intelligence was probably in the low average range, indicating no mental retardation. As to psychological maturity, both experts agreed that H.V.T. lacks emotional and psychological resources. Dr. O'Neill characterized H.V.T.'s behavior as distant. However, again no evidence was submitted indicating that H.V.T. has the psychological maturity of a child. Dr. O'Neill testified that there was no indication that H.V.T. was out of touch with reality but that H.V.T.'s traits were characterological, fixed, and persistent and that they were unlikely to change over time. I find that the intellectual development and psychological maturity factor favors transfer." (internal citations omitted)).

### E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

The defendant apparently has not received any prior treatment or counseling. (*See* Kucharski Report at 2 ("[The defendant] reported that during his incarceration [in El Salvador], he was provided with academic and vocational training, but minimal counseling. He reported that he did not receive any mental health treatment. . . .").) Accordingly, this factor is neutral in the transfer analysis. *See Juvenile Male*, 554 F.3d at 469 (factor was neutral where defendant had not been enrolled in any formal treatment program).

### F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserts that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 21.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*)

 The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Defense counsel also noted several facilities and programs for which the defendant would still be eligible. (Def.'s Mem. of Law at 5–6.) Thus, the Court finds that this factor

weighs against transfer, but does not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors, in combination, overwhelmingly favors transfer. *See Doe # 3*, 113 F.Supp.2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (internal quotation marks, alterations, and citation omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. As an initial matter, the defendant is charged with two attempted murders in connection with his alleged participation in the violent activity of the MS–13 street gang—these are precisely the types of serious crimes that weigh strongly in favor of transfer. Moreover, despite his lack of a criminal record and no indication of any past treatment efforts, a review of the record clearly demonstrates that the defendant is not likely to respond to rehabilitative efforts if he is convicted of the charged crimes and provided with juvenile rehabilitation programs. Indeed, Dr. Kucharski candidly and succinctly concluded that there was "very little evidence that [the defendant], if placed within the juvenile system, would benefit from rehabilitation." (Kucharski Report at 4.) Furthermore, as Dr. Kucharski also noted, the fact that the defendant is already nineteen years old, considered in conjunction with the other factors, strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent

age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *J. Anthony G.*, 690 F.Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, the Court finds that the rehabilitation potential for the defendant—who has "a significant history of antisocial behaviour" and suffers from a "criminalistic" mindset (Kucharski Report at 4)—is extremely low, and short-term rehabilitation efforts in a juvenile program are therefore very likely to be futile.[12]

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here are very serious, and given that the record demonstrates that the defendant is extremely unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

## IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

---

12. The Court notes that, even without Dr. Kucharski's report, the Court would conclude that the overall balancing of the statutory factors still favors transfer, primarily because of the following: (1) the violent nature of the two alleged attempted murders; (2) the allegations related to the defendant's substantial participation in the violent activities of the MS–13 street gang; and (3) the defendant was over seventeen at the time of the two alleged attempted murders and is currently over nineteen years old. *See, e.g., Doe # 3*, 113 F.Supp.2d at 609 (granting transfer motion even where defendant's social background, his present intellectual development, and the availability of treatment programs weighed against transfer, and defendant's psychological maturity was a neutral factor); *Doe # 1*, 74 F.Supp.2d at 320–21 (transferring case even though defendant's social background, his present intellectual development and psychological maturity, his response to past treatment efforts, and the availability of treatment programs all weighed against transfer).