**UNITED STATES of America,**

v.

**John DOE # 3 (RM), Defendant.**

**No. S1298CR438 (RLC).**

United States District Court,
S.D. New York.

Sept. 14, 2000.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Joshua G. Berman, John M. Hillebrecht, Assistant United States Attorneys, of counsel, of United States of America.

Krantz & Berman LLP, New York City, Larry H. Krantz, of counsel, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

The government has filed a juvenile information ("information") against defendant John Doe # 3 ("John Doe") charging him with ten acts of juvenile delinquency. Now before the court is the government's motion to transfer defendant for adult criminal prosecution pursuant to the Juvenile Delinquency Act ("JDA"), 18 U.S.C. §§ 5031 et seq.

## BACKGROUND

The charges against John Doe stem from his alleged involvement in the 165th Street Organization ("165 Organization"), a criminal enterprise based in the Bronx and operating in New York, New Jersey and Pennsylvania. Its members are reputed to have engaged in interstate narcotics trafficking and a host of violent acts. Three defendants allegedly associated with the 165 Organization were initially charged with various crimes in a criminal indictment filed on May 13, 1998, and ten more defendants have since been added in superseding indictments.

On March 15, 2000, the government filed a juvenile information against John Doe charging him with acts of juvenile delinquency occurring between 1994, and September 15, 1999, including armed robbery, kidnapping, murder, racketeering and the possession and distribution of powder and crack cocaine. He is specifically charged with participating in, among other things, the March 15, 1995 armed robbery, kidnapping and murder of an individual

named Francisco Soto ("Soto"), and a May 22, 1996 armed robbery.

On April 19, 2000, the government moved to prosecute defendant as an adult pursuant to the discretionary transfer provisions of 18 U.S.C. § 5032. The United States Attorney for the Southern District of New York has certified, pursuant to authority delegated to her by the Attorney General of the United States, that John Doe is a juvenile as defined by 18 U.S.C. § 5031, that the charged offenses include violent felonies and that there is a substantial federal interest in the case. *See* 18 U.S.C. § 5032.

In accordance with the requirements of the JDA, on August 10 and 14, 2000, the court held a hearing to determine whether transfer was warranted. The sole witness to testify was Dr. Barry Rosenfeld, a forensic psychologist who examined John Doe on behalf of the government.

## DISCUSSION

A juvenile who is alleged to have committed a felony which is a crime of violence after his fifteenth birthday may be transferred for adult criminal prosecution pursuant to 18 U.S.C. § 5032 only if such transfer is in the "interest of justice." *See United States v. Nelson,* 68 F.3d 583, 588 (2d Cir.1995) ("Nelson I"). The district court is required to consider the following six factors in weighing a motion to transfer: (1) the juvenile's age and social background; (2) the nature of the alleged offense; (3) the nature and extent of the juvenile's prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) the availability of programs designed to treat the juvenile's behavioral problems. *See* 18 U.S.C. § 5032. While the court must consider and make findings on each of the six factors, it is not required to afford equal weight to each factor and may balance them as it deems appropriate. *See United*

*States v. Juvenile Male # 1,* 47 F.3d 68, 71 (2d Cir.1995).

Permeating the transfer decision is the notion of rehabilitation, which "is one of the primary purposes of the juvenile delinquency provisions." *Nelson I,* 68 F.3d at 590. *See also United States v. Nelson,* 90 F.3d 636, 640 (2d Cir.1996) ("Nelson II") (noting that court's assessment of a juvenile defendant's potential for rehabilitation is a crucial determinant in transfer decision). Accordingly, juvenile adjudication is presumed appropriate unless the government establishes by a preponderance of the evidence that prosecution as an adult is warranted. *See United States v. John Doe,* 49 F.3d 859, 868 (2d Cir.1995). The desire to encourage rehabilitation must be balanced, however, against the "need to protect the public from violent and dangerous individuals." *Juvenile Male # 1,* 47 F.3d at 71.

### Factors

#### 1. Age and Social Background

John Doe, born in the Bronx on May 1, 1979, was between the ages of fifteen and eighteen at the time of the crimes charged in the information. In particular, he was fifteen years old at the time Soto was murdered and seventeen years old when he was arrested for armed robbery in 1996. He is currently 21 years of age.

Defendant was raised in the Bronx as the youngest, along with a twin brother, of several children. Although he also has six half-siblings and several foster siblings, he primarily grew up with his twin brother and a half-brother approximately twenty years his senior. Defendant's father, who was HIV positive, died of a heroin overdose when defendant was eleven years old. His mother died in 1997, from an AIDS-related illness while defendant was eighteen years old and incarcerated. Defendant currently has little contact with his remaining family members: he is unaware of his twin brother's whereabouts and has

only maintained relationships with two of his older sisters.

Defendant's family was poor, neither of his parents worked and the family relied on public assistance, and he described his childhood as rough, primarily due to poverty, his parent's drug use and his father's premature death. Nonetheless, he reported having good family relationships and denied ever having been physically or sexually abused. Yet after his father's death, which greatly upset him, defendant received less supervision from home and soon became involved in criminal activity. By the age of fourteen, he was allegedly involved with the 165 Organization and had been arrested for armed robbery.

Around the age of thirteen, defendant began using alcohol and marijuana, the latter of which he used daily throughout his teenage years. He reported that he has abstained from using marijuana during his current incarceration but that he had used drugs while imprisoned on Riker's Island for an earlier offense. He also admitted to having occasionally used cocaine when he was a teenager.

Also around the age of twelve or thirteen, defendant began a long-term relationship with a woman he described as his "common-law wife", and with whom he had a daughter who is now six years old. He continues to maintain a good relationship with both of them. They reside in the Bronx and visit him regularly in prison. Defendant also claimed to have had relationships with many other women, some of whom also visit him in prison.

Before defendant's incarceration, which forced him to withdraw from school in the tenth grade, he was an adequate student.

He generally passed his classes and was never forced to repeat a grade, although he had received some special educational services in elementary and junior high school. He did not have any significant behavioral or disciplinary problems in school.

Finally, as part of defendant's social background, the court will consider the allegation that on August 9, 1997, when defendant was eighteen years old, he stabbed an individual in the abdomen during a fight. The wound was so severe it exposed the victim's internal organs and necessitated a three-month hospital stay. Criminal charges were filed against defendant but were later dismissed, before he was arrested, because certain witnesses to the stabbing recanted their testimony.[1]

### 2. Nature of the Alleged Offense

John Doe is charged with ten acts of juvenile delinquency, including drug trafficking and various crimes of violence.[2] The charges arise from his reported involvement with the 165 Organization. One of the more serious offenses is his alleged participation in the robbery, kidnapping and murder of Soto. On March 15, 1995, defendant allegedly laid in waiting for the victim, attacked and handcuffed him, threw him in the back of a van, threatened him with a loaded gun and stood lookout while another member of the 165 Organization shot and killed him. Afterwards, defendant received approximately $35,000 worth of cocaine, stolen from Soto, as payment for his involvement in the crime.

Defendant has also been charged with involvement in the 165 Organization's extensive cocaine, crack and heroin distribution operation; the attack and shooting of

---

1. Since defendant was never arrested or charged with any crime in relation to this incident, the court considers it under this factor and not in its consideration of his prior juvenile delinquency record. *See United States v. John Doe # 1,* 74 F.Supp.2d 310, 316 n. 5 (S.D.N.Y.1999) (Carter, J.) (stating court may consider evidence of incidents and behaviors that have not led to arrests or convictions in its analysis of either a defendant's age

and social background, psychological maturity or response to past treatment efforts).

2. For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the information. *See United States v. Nelson,* 68 F.3d 583, 589 (2d Cir.1995) ("Nelson I").

an individual in Reading, Pennsylvania in an effort to resolve a drug dispute; and an armed robbery in New York City on May 22, 1996.

### 3. Nature and Extent of Defendant's Prior Delinquency Record

At the outset, the court expresses its dismay with the government's lateness in producing defendant's juvenile court records. The court authorized the government to procure these records from the clerk of the Family Court in Bronx County on May 30, 2000. The clerk of that court certified, on June 21, 2000, that no records pertaining to defendant were found on file. Regardless, the government did not provide the court with a copy of the clerk's certification until three months later, after it had already submitted its post-hearing brief.

The JDA expressly commands:

A juvenile shall not be transferred to adult prosecution ... until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record, or that the juvenile's record is unavailable and why it is unavailable.

18 U.S.C. § 5032. Although this record certification provision has been interpreted "to afford the government a limited amount of flexibility" in its efforts to comply, *United States v. Wong,* 40 F.3d 1347, 1369 (2d Cir.1994), the government "should always endeavor to supply the district court with official juvenile court records prior to the filing of an information", *id.* at 1370. The government's tardiness in this case is troubling, but the court will assume that it has complied, albeit at the bare minimum, with the statutory requirement because the court was able to review the records prior to its determination of the

government's motion, there is no evidence that the government has acted in bad faith and defendant has not argued that he was prejudiced by the delay. *See id.*

John Doe has no prior juvenile adjudications. He was arrested in 1993, however, when he was only fourteen years old, for participating in an armed robbery.[3] All of the charges against him relating to this alleged crime were ultimately dismissed. Defendant was also arrested on May 23, 1996, for participating, along with two others, in the armed robbery of a known drug dealer.[4] He pleaded guilty to criminal possession of a weapon in the third degree and, on August 28, 1997, was sentenced to one to three years imprisonment. On November 13, 1997, he was paroled but was then rearrested on October 21, 1999, for violating his parole. Defendant's violation stemmed from his failure to both appear for a scheduled appointment with his parole officer and follow the directives of his parole, i.e., attend school, attend a one hour per day substance abuse program and pursue employment. Defendant later explained that he violated his parole because its terms put too much pressure on him.

### 4. Intellectual Development and Psychological Maturity

Defendant reported having been an adequate student who generally passed his classes and never repeated a grade. Dr. Rosenfeld reported that defendant had an estimated IQ of approximately 82 according to the Wechsler Abbreviated Scale of Intelligence ("WASI"). The WASI, the only cognitive test administered by Dr. Rosenfeld, is a brief, standardized test of intellectual functioning. John Doe's score placed him in the twelfth percentile of intellectual functioning for individuals in his age group. It also placed him in the

---

**3.** The court may consider evidence of both John Doe's prior arrests as well as his convictions in analyzing the nature and extent of his prior delinquency record. *See John Doe # 1,* 74 F.Supp.2d at 316 n. 5.

**4.** The court notes that one of the other participants in this robbery was Manuel Gonzalez, who the court transferred to adult status in this case last year. *See John Doe # 1,* 74 F.Supp.2d 310.

range of low average intelligence to borderline mental retardation. Dr. Rosenfeld opined that while defendant's level of intelligence was well below that of the typical person his age, it was still well above the cutoff for mental retardation and, in his professional experience, did not appear substantially below the norm for convicted felons.

As to defendant's psychological maturity, Dr. Rosenfeld provisionally diagnosed defendant with both an antisocial personality disorder ("ASPD") and a substance abuse problem, i.e., marijuana abuse.[5] He also offered a possible, or what he termed a "rule out", diagnosis of an adjustment disorder. He pointed out that defendant's clinical presentation did not reveal any evidence of major mental illness or any particular deficits in psychological maturity. He was therefore convinced that defendant's criminal and antisocial acts reflected a psychopathic personality and not mere immaturity. Although outpatient mental health treatment, substance abuse treatment and vocational training were warranted, Dr. Rosenfeld believed that defendant's personality made it unlikely that he would benefit from such programs or that they would significantly reduce his potential for future criminal behavior.

Dr. Rosenfeld based his opinion partially on defendant's responses to the Minnesota Multiphasic Personality Inventory, Revised ("MMPI-2"), a test which identifies mental disorders and overall patterns of personality and behavior, including test-taking behavior. Dr. Rosenfeld confessed that defendant's MMPI-2 results were of questionable validity because his answers were clearly engineered to unrealistically portray him as an honest and virtuous person with few psychological problems.

Nonetheless, despite these efforts to skew the test results, the MMPI-2 revealed that defendant was an angry person with a defensive personality. He harbored resentment towards his family and authority figures, often felt misunderstood and was quick to misinterpret other's actions as negative. Consequently, he made impulsive decisions with little regard for the needs and interests of others. Since defendant usually anticipated negative interpersonal interactions, he felt justified manipulating and taking advantage of others.

The MMPI-2 results also indicated that defendant was suffering a moderate amount of anxiety and nervousness. Dr. Rosenfeld interpreted this as symptomatic of situational stress, i.e., defendant's incarceration and pending criminal trial, and diagnosed defendant with a possible adjustment disorder. Since defendant's symptoms did not reflect longstanding psychological problems, psychological interventions were unlikely to be helpful. Dr. Rosenfeld opined that his symptoms would likely abate over time.

The second test administered by Dr. Rosenfeld, the Psychopathy Checklist, Revised ("PCL–R"), assessed defendant's psychopathic personality traits. Dr. Rosenfeld offered it as the single best predictor of person's future criminal recidivism, violent recidivism and failure to respond to treatment. In this case, the checklist indicated that defendant suffered a substantial degree of psychopathy; his PCL–R placed him in the 67th percentile relative to other convicted felons. While slightly below the cutoff used to classify individuals as psychopathic, Dr. Rosenfeld felt that it suggested a considerable risk for violent or criminal recidivism and a relatively poor prognosis for psychological interventions.

Based on these two tests, a clinical examination and a review of defendant's criminal record, Dr. Rosenfeld's report diagnosed defendant as having classic ASPD, i.e., his personality was marked by a longstanding pattern of rule-breaking

---

**5.** Although Dr. Rosenfeld concluded that a diagnosis of marijuana abuse was likely warranted, he admitted in his report that the actual extent of defendant's drug use was unknown.

and a severe lack of empathy. Dr. Rosenfeld explained during his testimony that while a diagnosis of ASPD did not necessarily suggest criminal behavior per se because there are plenty of people with ASPD who do not commit crimes, there is nevertheless a high overlap between ASPD and criminal behavior. He also testified that his diagnosis of defendant's ASPD was based in large part on his knowledge of defendant's past antisocial behaviors, including his prior parole violation, lack of fidelity to his "common-law" wife, lack of any vocational history or realistic long-term life plan, and prior criminal behaviors, including substance abuse.

### 5. Response to Past Treatment Efforts

John Doe had not undergone any psychiatric or psychological treatment in the past. While on parole he was required to attend a daily, hour-long drug treatment program and pursue his education. He failed to do both.

### 6. Availability of Treatment Programs

Dr. Rosenfeld testified that the types of rehabilitative programs he thought would be most suitable for defendant, i.e., outpatient mental health treatment, substance abuse treatment and vocational training, were widely and readily available. He was presumably referring to the general availability of these programs outside of the prison system.

The government otherwise provided no information about the availability of either juvenile or adult treatment programs for defendant's behavioral problems. It did not indicate where defendant might be incarcerated if he were sentenced as a juvenile, nor did it present any evidence that it had investigated various juvenile programs but found none of them suitable. Rather, the government simply asserted that since defendant is now 21 years of age he is ineligible to participate in any juvenile rehabilitation programs.

### Analysis of Factors

The following factors weigh against the transfer of John Doe to adult status: his social background, his present intellectual development and the availability of programs designed to treat his behavioral problems. John Doe has clearly had a troubled and impoverished childhood, punctuated by his parents' drug use and early deaths. The loss of his relationship with his father, and the ensuing strains on his mother, undoubtedly contributed to his drift into criminal behavior. Defendant's low IQ score also disfavors his prosecution as an adult.

In addition, the court finds that since the government did no more than "merely assert the unavailability of an appropriate [juvenile rehabilitative] program" for defendant, it failed to carry its burden of persuading the court that no such programs exist. *Nelson I,* 68 F.3d at 591 (stating government must "make a showing that it has investigated various options but is still unable to find a suitable and available program" for a juvenile's behavioral problems).

The court finds the following factors to be neutral: defendant's age at the time of the crimes charged in the information and his psychological maturity. Defendant's alleged commission of the offenses in the information when he was as young as fifteen, and as old as eighteen, years of age neither favors nor disfavors transfer.

As to defendant's psychological maturity, the court initially notes its surprise that defense counsel failed to submit any report or testimony from the psychologist it was authorized to hire and have examine defendant. This omission tends to bolster Dr. Rosenfeld's report inasmuch as it suggests that his opinions were not contradicted by defendant's expert.

Nonetheless, the court finds Dr. Rosenfeld's diagnoses as too provisional and too reliant on questionable assumptions to be persuasive. First, even if it is true that defendant's infidelity reflects an irresponsible or immature personality, such behavior cannot seriously be considered indicative of a criminally antisocial or

pathological personality. This strains credulity. Second, defendant's lack of vocational history undoubtedly reflects his poverty as much as it may reflect a supposed unwillingness to engage in legitimate work. It may also reflect his difficulty finding work without a high school degree and burdened with a criminal record. Third, any conclusion about defendant's psychopathy based on a belief that he continues to use marijuana is speculative, as Dr. Rosenfeld admitted, at best. Moreover, although smoking marijuana is criminal, it is not necessarily indicative of psychopathy and it is certainly not suggestive of violent criminal recidivism. Fourth, the reliability of defendant's psychological test results was undermined by Dr. Rosenfeld's admission that the MMPI–2 results were of questionable validity and that the PCL–R assessment was hindered by a lack of objective information about defendant's past. Dr. Rosenfeld testified that he was therefore unsure about, and did not even rate, many of the items on the PCL–R.

Ultimately, the most persuasive evidence supporting Dr. Rosenfeld's diagnosis of ASPD, as well as his opinion that defendant was unlikely to benefit from rehabilitation, was defendant's prior parole violation. By itself, it strongly suggests a likelihood that defendant will benefit little from further rehabilitative efforts. However, the court is already obliged to consider defendant's parole violation under other factors. Moreover, it alone—or even in conjunction with other evidence— does not compel the conclusion that plaintiff is psychopathic.

In spite of the foregoing, the court concludes that transfer of John Doe to adult status is warranted in the interest of justice. In carefully weighing the factors, the court is particularly concerned about the seriousness of the crimes alleged, defendant's recidivist behavior and his current age. Defendant is charged with a host of serious crimes, including murder and other acts of violence, that arise out of his alleged involvement with a criminal organization. The disturbing nature of these crimes; defendant's continued involvement in them even after his parole from state prison; his prior conviction for criminal possession of a loaded gun; and his arrest for armed robbery in 1993, heighten the court's concern about the threat he poses to society. *See Nelson I*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors.").

Of equally grave concern to the court is defendant's demonstrated tendency to revert to criminal behavior. Defendant had already been given at least one opportunity to straighten his life out when he was paroled, yet he apparently continued to engage in narcotics trafficking and other crimes. Although the court recognizes that while on parole defendant was not provided with the resources, supervision and guidance necessary for him to fully benefit from rehabilitation, it cannot disregard his lack of motivation to change and his confessed inability to cope with the commonplace pressures of school and work. Defendant's parole violation is particularly troubling given the financial and parental responsibilities he shares for raising his young daughter but which he largely abdicated upon his return to prison. Inasmuch as rehabilitation is a primary purpose of the federal delinquency provisions, including 18 U.S.C. § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted.

## CONCLUSION

For the reasons stated above, the government's motion for discretionary transfer in the interest of justice is granted.

**IT IS SO ORDERED.**