**UNITED STATES of America,**

v.

**JUVENILE MALE, Defendant.**

**No 16–CR–510 (JFB)**

United States District Court, E.D. New York.

Signed September 7, 2017

The United States is represented by Bridget M. Rohde, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by Raymond A. Tierney, Assistant U.S. Attorney.

Defendant Juvenile Male is represented by Glenn A. Obedin, Naiburg, Obedin & Weissman, LLP, The Courthouse Corporate Center, Suite 4200, 320 Carleton Avenue, Central Islip, NY 11722.

## MEMORANDUM AND ORDER

Joseph F. Bianco, District Judge:

On September 22, 2016, the government filed a Juvenile Information ("Information") against defendant Juvenile Male (the "defendant"),[1] charging him with one count of conspiracy to murder in aid of racketeering, one count of attempted murder in aid of racketeering, and one count of assault with a dangerous weapon, 18 U.S.C. § 1959(a)(5), as well as one count of brandishing and discharging a firearm(s) in furtherance of a crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii), 924(c)(2). (Dkt. No. 10.) These charges relate to the alleged attempted murder of a juvenile male at the

1. Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Superseding Information should be sealed.

public library in Brentwood, New York on January 15, 2016. On March 2, 2017, the government filed a Superseding Juvenile Information ("Superseding Information"), charging defendant with the counts contained in the initial Information, as well as one count of racketeering, 18 U.S.C. § 1961(1); one count of racketeering conspiracy, 18 U.S.C. §§ 1962(d), 1963; a second count of conspiracy to murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); and a second count of murder in aid of racketeering, *id.* (Dkt. No. 24.) The additional charges relate to the alleged brutal murder of Jose Pena ("Pena") on June 3, 2016 in a wooded area adjacent to the grounds of a largely abandoned psychiatric hospital complex.

The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On August 31, 2017, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion. This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the government's motion to transfer to adult status is granted. More specifically, as discussed in great detail below, after carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that defendant's transfer to adult status is warranted.

First, the nature of the alleged offenses—namely, the alleged attempted murder of an individual the defendant allegedly believed to belong to a rival gang, where defendant allegedly shot the victim with a handgun in the torso four times, and the brutal, heinous murder of Pena, which defendant allegedly orchestrated

and involved defendant allegedly taking turns stabbing and slashing Pena with other La Mara Salvatrucha ("MS–13") members, with the alleged motivation being that Pena was suspected of cooperating with law enforcement and being gay—overwhelmingly favors, in the interest of justice, transferring the case to district court so that defendant can be prosecuted as an adult. Moreover, the callous attempted murder and murder are alleged to have been committed as part of defendant's alleged participation in MS–13. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile system, including the limited sentencing options available in that system if defendant is found guilty (such as the statutory maximum of five years' incarceration), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these serious charges when considered in conjunction with the other statutory factors.

Second, with respect to the statutory factor regarding defendant's age and social background, although he allegedly committed the attempted murder at the age of sixteen years and six months, he allegedly continued his violent criminal activity after that shooting and was nearly seventeen years old at the time he allegedly orchestrated and participated in the brutal murder of Pena. In addition, defendant reported that he had never suffered abuse of any kind, and he was surrounded by supportive family his entire life, yet he still turned to gang activity, as alleged in the Superseding Information. The Court concludes that this factor, when both age and social background are considered, weighs in favor of transfer.

The Court finds that defendant's lack of a juvenile record weighs against transfer; however, the Court determines that, in the

instant case, after balancing of all the statutory factors (including this one), transfer is in the interest of justice.

Fourth, with respect to the statutory factor regarding defendant's present intellectual development and psychological maturity, defendant's forensic psychological evaluation also supports transfer of defendant to adult status. In particular, the psychologist concluded that defendant appeared to be of average intelligence, displayed a level of psychological and emotional maturity beyond that of the average teenager of the same age, and "deviate[s] from the neuropsychological makeup of an immature and impulsive juvenile" in regards to his actions, the complexity of his decision making, his ability to synthesize information from different sources, and his planning ability. In addition, the psychologist determined that defendant was a poor candidate for rehabilitation. Moreover, defendant's alleged leadership role in the premeditated murder of Pena provides additional support for finding that this factor weighs in favor of transfer. Thus, in light of the foregoing, the Court determines that this statutory factor weighs strongly in favor of transfer.

Fifth, the factor regarding past treatment efforts is neutral because the record indicates that defendant has not previously received any treatment. Finally, although the final factor weighs against transfer given the apparent availability of out-of-state juvenile facilities that would have programs designed to treat defendant's behavioral problems, this factor does not outweigh the other factors that, in combination, overwhelmingly favor transfer. In particular, the serious and violent nature of the offenses, including the fact that they were allegedly committed on behalf of the MS–13 gang and, in the case of the Pena murder, was allegedly committed for the heinous reason that Pena was suspected of cooperating with law enforcement and of being gay, coupled with defendant's age and social background, as well as his intellectual development and psychological maturity, overwhelmingly favor transfer.

In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined in its discretion that the interest of justice would be served by treating defendant as an adult in this case.[2]

---

**2.** This decision is consistent with other cases in which this Court has transferred juveniles to adult status for their alleged participation in violent acts in aid of the MS–13 street gang. *See, e.g., United States v. Juvenile Male,* No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was seventeen years, ten months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male,* No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was sixteen years, seven months old at time of alleged attempted murder of a sixteen-year-old male, and seventeen years, eight months old at time of alleged murder of another individual); *United States v. Juvenile Male,* No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was seventeen years, four months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male,* 844 F.Supp.2d 333 (E.D.N.Y. 2012) (defendant was sixteen years, three months old at time of alleged murder of a fifteen-year-old); *United States v. Juvenile Male No. 2,* 761 F.Supp.2d 27 (E.D.N.Y. 2011) (defendant was sixteen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son); *United States v. Juvenile Male,* 844 F.Supp.2d 312 (E.D.N.Y. 2011) (defendant was seventeen years, six months old at time of two alleged attempted murders); *United States v. Juvenile Male,* 754 F.Supp.2d 569 (E.D.N.Y. 2010) (defendant was seventeen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son).

## I. THE CHARGES [3]

The charges against the defendant stem from the government's continuing investigation into the activities of the violent street gang MS–13. (Gov't Mem. of Law 2–3.) Since approximately 1998, members of MS–13 on Long Island are alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS–13 and rival gang members, as well as their families and innocent bystanders. (*Id.*) In addition to targeting rival gang members, MS–13 members have engaged in violent attacks on individuals whom they mistakenly believe are in a rival gang and on individuals whom they believe are cooperating with law enforcement. (*Id.* at 3.) MS–13 members agree at the time of their induction into the gang to kill "chavalas," or members of rival gangs, whenever possible. (*Id.* at 5.)

In this case, defendant has been charged in connection with the attempted murder of a member of a rival gang, Goon Squad, and the murder of an MS–13 member suspected of cooperating with law enforcement and violating the rules of the MS–13 organization. (*Id.* at 2–3.)

Specifically, the attempted murder allegedly occurred on January 15, 2016, at approximately 2:00 p.m. (*Id.* at 6.) According to the government, at that time, the defendant, along with several other members of MS–13, including Pena, got into an altercation with three individuals whom the MS–13 members believed to be members of the rival gang Goon Squad in the vicinity of a public library in Brentwood, New York (the "Brentwood Library"). (*Id.* at 6–7.) During the confrontation, the defendant allegedly removed a .45 caliber semi-automatic handgun from his waistband and shot one of the members of the rival group in the torso. (*Id.* at 7.) The defendant and the other MS–13 members allegedly fled from the Brentwood Library. (*Id.*) The victim was taken to the hospital and survived the shooting. (*Id.*) After a brief search, the defendant was located at approximately 3:15 p.m. that day at a McDonald's restaurant in Brentwood. (*Id.*) The defendant was arrested and subsequently released on bail. (*Id.* at 8.) Pena was also arrested and subsequently released on bail. (*Id.*)

According to the government, after being released on bail, the defendant demanded to see the arrest paperwork of the other MS–13 members arrested in connection with the attempted murder, including the paperwork of Pena. (*Id.*) Thereafter, the defendant allegedly informed other members of his clique, the Freeport Locos Salvatruchas clique ("FLS"), that he suspected that Pena (who was a member of a different clique) had cooperated with the police and was a "rat." (*Id.*) In May 2016, members of FLS saw Pena at a bar with another man and, based upon their observations, suspected that Pena was gay. (*Id.*) Being gay is unacceptable under the rules of MS–13. (*Id.*) Based upon the suspicion that Pena had violated the rules of MS–13 by being gay and by cooperating with law enforcement, members of FLS held a series of meetings and discussed punishing

---

**3.** The allegations set forth herein were drawn from the Information and Superseding Information and from the government's motion papers and supporting documentation. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

Pena. (*Id.* at 9.) After consulting with MS–13 leaders in El Salvador, the defendant and other FLS members agreed to kill Pena. (*Id.*) The defendant, as leader, assigned tasks to the other FLS members, including procuring weapons and a vehicle to be used in the murder. (*Id.*)

The government further alleges that, on June 3, 2016, the defendant and four other FLS members lured Pena into a car and drove him to a wooded area adjacent to the grounds of a largely abandoned psychiatric hospital complex, where MS–13 frequently held meetings. (*Id.*) After walking into the woods, the group allegedly surrounded and attacked Pena, taking turns stabbing and slashing him with knives. (*Id.*) After killing Pena, the group fled the area. (*Id.*)[4]

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

■ "A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[5] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe # 3*, 113 F.Supp.2d 604, 605 (S.D.N.Y. 2000).

■ Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for re-

---

4. Other MS–13 members have been indicted in connection with the Pena murder in federal court in the Eastern District of New York. (*Id.* at 10.)

5. In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that .... the offense charged is a crime of violence that is a felony ... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law 14; *see* Dkt. No. 24–1 (Superseding Juvenile Certification).)

habilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision ... [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance [between] .... affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[6]

### III. Analysis of Factors

#### A. Juvenile's Age and Social Background

 The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application"). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) ("[T]he [district] court's noting A.R.'s advanced age was consistent with this Court's and other courts' conclusions that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult." (collecting cases)).

 In this case, the defendant, born in July 1999, was approximately sixteen

---

**6.** Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and

(3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer, *See* 18 U.S.C. § 5032; *United States v. Juvenile Male # 1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

years, six months old at the time of the alleged attempted murder, sixteen years, eleven months at the time of the alleged murder, and eighteen years, two months at the time of the hearing.[7] Dr. Bardey, the psychologist retained by defense counsel to evaluate the defendant, concluded that the defendant should be transferred to adult status in part because "his behavior, thought processes, and attitudes about criminality render him a poor candidate for rehabilitation." (Bardey Report 22.) Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that, although the defendant was sixteen years, six months at the time of the attempted murder, the defendant's current age of eighteen, which would allow him only five years[8] in a juvenile detention facility to rehabilitate himself, combined with Dr. Bardey's assessment that he is a poor candidate for rehabilitation, and the fact that he allegedly continued his violent criminal activity and was nearly seventeen

years old at the time of the Pena murder, cumulatively weigh strongly in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (citation omitted)); *United States v. Doe*, 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. H.V.T.*, No. 96–cr–244 (RSP) (GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer.").[9]

7. Although the government has not provided the Court with a copy of the defendant's birth certificate, the defendant does not dispute that the date of birth he provided to law enforcement officials was accurate. The psychologist's evaluation of the defendant also noted this date of birth. (*See* Forensic Psychological Evaluation ("Bardey Report") by Dr. Alexander Sasha Bardey ("Dr. Bardey"), Gov't Ex. 3, at 2.) "Gov't Ex." refers to the government's exhibits that were admitted into evidence by stipulation of both parties at the August 31, 2017 transfer hearing.

8. *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend in the case of a juvenile who is between eighteen and twenty-one years old who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of five years or the maximum of the guideline range.")

9. The defendant argues that the Court cannot make conclusions as to whether the defendant

has the potential to rehabilitate because the defendant has never made any rehabilitative efforts, including receiving treatment. (Def. Mem. of Law 5.) However, the Court is required to make such an assessment based on the available record, even where no treatment has been previously afforded the defendant. *See Nelson II*, 90 F.3d at 640 ("Permeating the transfer decision and the six-factor inquiry is the notion of rehabilitation.... [T]he district court's assessment of the juvenile defendant's potential for rehabilitation is a crucial determinant in the transfer decision."). Further, this Court is required to balance the defendant's potential for rehabilitation "against the threat to society posed by juvenile crime." *Id.* Here, where the record indicates the defendant is a "poor candidate for rehabilitation" (Bardey Report 22), and the defendant poses a threat to society, as evidenced by his alleged commission of these serious offenses—one of which he committed while released on bail—the Court finds that transfer is in the interest of justice.

The Court also finds that the defendant's social background weighs in favor of transfer. According to the information self-reported by the defendant to Dr. Bardey, the defendant was born in El Salvador. (Bardey Report 2.) Although the defendant did not have contact with his father for the first ten years of his life, he lived with his mother and maternal grandmother during his early years in El Salvador and "had a close and loving relationship with his step-father." (*Id.*) The defendant described his childhood as normal and his mother as a "good person" who worked very hard to help her children "get ahead," setting a good example for him and his siblings. (*Id.* at 3.) The defendant also stated that his family lived in poverty. (*Id.*) The defendant denied a history of abuse of any kind. (*Id.*)

The defendant's description of when he became involved with MS–13 was inconsistent. On the one hand, he explained that he became involved with MS–13 after learning at the age of twelve years about a sexual assault of his mother that occurred before he was born by an individual still known to the defendant's family, and the defendant explained that, upon learning about the incident, he felt angry, sad, and unsafe. (*Id.*) According to the defendant, this led him to confront the individual, and he became involved with MS–13 as a result. (*Id.* at 4.)

However, the defendant also stated inconsistently that he became disengaged from MS–13 when he was ten years old. (*Id.*) [10] At that age, the defendant's mother and stepfather moved to the United States,

and he began living with his paternal grandparents on a farm. (*Id.*) He said this change led him to have no further involvement with MS–13. (*Id.*) The defendant maintained that he did not officially join MS–13 until he lived in the United States. (*Id.*)

At the age of fifteen years, the defendant arrived in Brentwood, New York and resided with his biological parents. (*Id.*) The defendant reported feeling vulnerable during this period. (*Id.* at 4–5.) He was suspended from high school once for displaying gang signs and another time for his involvement in a physical altercation. (*Id.* at 5.) The defendant reported that he was harassed because other students suspected he was affiliated with MS–13. (*Id.* at 5–6.) He transferred between an alternative educational facility and regular school multiple times. (*Id.* at 6.) The defendant reported that, upon his second transfer to the alternative educational facility, he gave into the pressure to join the gang. (*Id.* at 7.) The government has provided evidence of the defendant's membership in MS–13 through, in part, pictures from the defendant's social media account, and his statements to the Suffolk County Police Department.[11] The defendant's membership in the gang allegedly persists to this day, and the government argues that these allegations are corroborated in part by the fact that defendant was wearing rosary beads, which are traditionally worn by MS–13 members to demonstrate membership, when taken into federal custody on September 20, 2016. (*See* Gov't Mem. of

---

10. Even without the defendant's contradiction in his description of his involvement with MS–13 while in El Salvador, the Court's decision that transfer is in the interest of justice would remain the same in light of the factors discussed herein.

11. In particular, the government alleges that the defendant admitted to his membership in the FLS clique. (Gov't Mem. of Law 8.) In addition, the defendant allegedly admitted to shooting the victim at the Brentwood Library and hiding the clothing he wore during the shooting, and he told the police the location of the handgun used in the shooting. (*Id.*)

Law 10.) [12]

Based on the foregoing, the Court finds that, although there is no indication that the defendant's family condoned or accepted criminal activity, the defendant did not personally experience any abuse of any kind, and, despite his experience resulting from knowledge of the sexual assault of his mother, he had a stable family life both during his years in El Salvador and his years in the United States, the defendant chose to be a member of and a leader in MS–13. Further, there is evidence that the defendant has chosen not to disassociate from MS–13 and that it is unlikely he will rehabilitate. Defense expert Dr. Bardey reported that the available information indicates that the defendant "is not an individual who has made genuine efforts and is not motivated to develop prosocial behaviors [or] distance himself from a violent lifestyle . . . ." (Bardey Report 21.) Dr. Bardey also stated that the defendant "has not displayed any remorse for his actions, continues to rationalize his behaviors and decisions, and maintains that allegiance with MS–13 is a lifelong commitment," rendering him "a poor candidate for rehabilitation." (*Id.* at 21–22.) Given that the defendant "qualifies for a diagnosis of Adolescent Antisocial Beahvior," (*id.* at 18),

"did not display any remorse for his actions," (*id*), and stated that membership in MS–13 is a lifelong commitment, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged.

Accordingly, the Court finds that the defendant's age and his social background, in conjunction, weigh strongly in favor of transfer. *See Doe*, 49 F.3d at 867 ("As to Doe's social background, the court noted that when Doe emigrated to the United States, his mother had stayed in Vietnam. Prior to the time of the offenses charged in the present prosecution, Doe's father had filed a petition in family court for judicial supervision of Doe. And by the time of the offenses charged in the present case, Doe was completely estranged from his father, preferring the violent BTK gang over his biological family. . . . [T]he court concluded that '[o]n balance, in view of [Doe's] long association with the Born to Kill, it seems that the social background that he lived in at that time was one that would be a factor weighing in favor of a transfer.' "); *H.V.T.*, 1997 WL 610767, at *4 ("It appears

12. The defendant takes issue with the government's characterization of his wearing of rosary beads, his alleged statements to the police, and the pictures from his social media account. (Def. Mem. of Law 3.) As to the rosary beads, the defendant states that they were worn as a religious act. (*Id.*) The Court does not need to consider the rosary beads, however, because the defendant has already admitted to his membership in MS–13 to Dr. Bardey, and defendant does not contend that he was not a member of MS–13. As to the alleged statements to the police, the Court also need not consider whether they were the "hollow boasts of a child," as the defendant suggests, because, for the purposes of this motion, the Court must assume all allegations set forth in the Superseding Information are true. As a result, the Court does not consider

the strength of the evidence that the defendant committed the crimes as charged, including the details of his alleged confession. In other words, the Court determines that, even were it to agree with the defendant's characterization of the statements, the Court would still grant the motion to transfer for the reasons stated herein. Thus, the statements do not alter the Court's findings. Finally, to the extent the defendant argues that the defendant's social media pictures, statements to the police, and high school records are relevant to the Court's determinations as to the defendant's present intellectual development and psychological maturity, the Court determines that they do not alter its conclusion that this factor weighs in favor of transfer in light of Dr. Bardey's findings, which are discussed in greater detail below. . . .

that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home ⋅ .... It also appears that H.V.T. became a member of a gang. He wears a tattoo containing a dragon and the letters [of his gang].... H.V.T. has been for some time completely estranged from his aunt in Florida who took him in following his prior conviction, and his brother indicates that he has had no contact with H.V.T. and would be unable to take care of him. I find that H.V.T.'s social background favors transfer."); *cf. Juvenile Male*, 554 F.3d at 468–69 ("In analyzing the first factor .... we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer. With respect to [the defendant's] social background, the record is mixed. The district court found that [the defendant] had been raised in 'a loving and intact family,' and saw nothing in his 'social background that would suggest to [him] that gang activity was acceptable behavior.' In contrast to his family situation, however, [the defendant's] life outside the home was not stable. He joined MS–13 around the age of fourteen, and dropped out of school during the ninth grade when his grades and behavior deteriorated. [The defendant] began abusing alcohol at the age of fifteen or sixteen and started using cocaine and marijuana shortly thereafter. Such behavior indicates a lack of structure and support, and accordingly weighs against his transfer. In these circumstances, the district court did not clearly err in concluding that [the defendant's] social background 'minimally' favored his transfer to adult prosecution.").

### B. Nature of the Offense Alleged

■ As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe # 1*, 74 F.Supp.2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Superseding Information are extremely serious crimes, and the defendant concedes that the nature of these alleged offenses is extremely serious. In the first instance, the defendant is accused of shooting John Doe in the torso. The defendant's motivation for this crime allegedly is that John Doe was the member of a rival gang. Further, the crime was allegedly committed in public during the day, when innocent bystanders could have easily been harmed. While released on bail for this crime, the defendant then allegedly orchestrated and committed the Pena murder. The defendant's sole motivations for the murder are allegedly that the defendant suspected Pena cooperated with the police in the attempted murder investigation and that MS–13 members suspected Pena was gay. The defendant's alleged brazen and violent crimes—at least one of which resulted from his leadership, and which resulted in injuries to one victim and the death of another—were also both committed as part of the defendant's participation in the violent racketeering activity of the MS–13 gang.

⋅ This Court determines that these offenses are undoubtedly the type of serious charges that weigh strongly in favor of transfer to adult status. Moreover, the Court finds that this factor also should be afforded more weight than any of the other factors. *See Nelson I*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing

this factor more heavily than the other statutory factors. The heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight." (citations omitted)). Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious—and even less serious—as the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe # 1*, 74 F.Supp.2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F.Supp. 760, 766 (S.D. Ind. 1988) ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder.").

## C. Nature and Extent of Any Prior Delinquency Record [13]

 The criminal history report run for the defendant reveals that he has no

---

13. Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253–54 (10th Cir. 1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (citations omitted)); *cf. A.R.*, 203 F.3d at 962 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe # 1*, 74 F.Supp.2d at 316 n.5 (not-

prior convictions. Moreover, the government has not produced any court records indicating that the defendant has a prior delinquency record.[14] Accordingly, the Court finds that this factor weighs against transfer. However, the Court notes that an absence of a prior delinquency record is not dispositive in a transfer determination and does not preclude the transfer of a defendant to adult status when, as in the instant case, a balancing of all the statutory factors (including this one) weigh in favor of transfer. *See, e.g., Juvenile Male*, 554 F.3d at 468–70 (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background); *J. Anthony G.*, 690 F.Supp. at 764–65 (granting government's transfer motion despite defendant's lack of a prior juvenile record).[15]

ing split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor"). *But see In re Sealed Case*, 89 F.2d 363, 369 n.12 (D.C. Cir. 1990) (stating that a "juvenile's alleged violations of law" are "entirely unrelated" to other factors in the transfer analysis). In any event, this Court need not resolve this question because there is no indication that the defendant has ever been arrested or convicted before his arrest in connection with the library shooting.

14. Section 5032 states that "[a] juvenile shall not be transferred to adult prosecution ... until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record ...." 18 U.S.C. § 5032. The Second Circuit has recognized, in relation to a prior version of § 5032 that required such records be produced before commencement of juvenile proceedings, that "[w]hile the language of the record certification provision of § 5032 is amenable to strict interpretation ... most

### D. Juvenile's Present Psychological Maturity and Intellectual Development

For the reasons set forth below, the Court finds that the defendant's intellectual development and psychological maturity, as discussed in Dr. Bardey's report, weigh strongly in favor of transfer.

As an initial matter, Dr. Bardey reported that the defendant: (1) exhibited thought processes that "were logical and goal-directed," and displayed no evidence of a thought disorder, psychotic symptoms, or symptoms of anxiety or depression (Bardey Report 14); (2) appeared to be "of average intelligence and was grossly intact cognitively" (*id.* at 15); (3) "displayed a level of psychological and emotional maturity beyond that of the average teenager of the same age" (*id.* at 18); and (4) "deviate[s] from the neuropsychological makeup of an immature and impulsive juvenile" in regards to his actions, the complexity of his decision making, his ability to synthe-

courts have read the records certification provision to require only good faith efforts by the government to provide the court with documentation of a juvenile prior record (or to the effect that no such record exists or is available)." *United States v. Wong*, 40 F.3d 1347, 1369 (2d Cir. 1994). In this case, it is undisputed that the defendant has no prior criminal record in the United States, and, as such, the Court finds that the criminal history report submitted to the Court, which reflect the defendant's complete lack of criminal history, demonstrate the government's good faith efforts to comply with the terms of § 5032.

15. The government also introduced evidence that, while incarcerated at the Suffolk County Correctional Facility, the defendant allegedly was found in possession of shanks and, in a separate incident, tampered with a security camera. (Gov't Mem. of Law 13; Gov't Ex. 6.) However, although the defendant has not disputed these allegations, the Court, in an abundance of caution, has not relied upon these allegations in any way in connection with its determination of the government's motion.

size information from different sources, and his planning ability (*id.* at 19). Thus, it is clear from the report that the defendant possesses sufficient intellectual capacity and psychological maturity to, if he so chose, conform his conduct to the law and to appreciate the gravity of the charges he is facing.

Furthermore, of great concern to the Court are Dr. Bardey's findings that the defendant "qualifies for a diagnosis of Adolescent Antisocial Behavior" and "minimized his behaviors, attempted to manipulate this examiner, and did not display any remorse for his actions" (*id.* at 18), as well as Dr. Bardey's ultimate conclusion that he would be "a poor candidate for rehabilitation" (*id.* at 22). Although the defendant points to the favorable description of him that his parents provided in their interview with Dr. Bardey, the Court finds this description consistent with Dr. Bardey's finding that the defendant is able to "shift his demeanor and presentation and conceal his affiliation with MS-13 from his parents," (Bardey Report 18), further supporting transfer.

Accordingly, the Court finds that the defendant's intellectual development and psychological maturity both weigh strongly in favor of transfer. *See A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); *H.V.T.*, 1997 WL 610767, at *5 ("Both psychologists testified that H.V.T.'s intelligence was probably in the low average range, indicating no mental retardation. As to

psychological maturity, both experts agreed that H.V.T. lacks emotional and psychological resources. Dr. O'Neill characterized H.V.T.'s behavior as distant. However, again no evidence was submitted indicating that H.V.T. has the psychological maturity of a child. Dr. O'Neill testified that there was no indication that H.V.T. was out of touch with reality but that H.V.T.'s traits were characterological, fixed, and persistent and that they were unlikely to change over time. I find that the intellectual development and psychological maturity factor favors transfer." (internal citations omitted)).

### E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

The defendant "has never participated in mental health treatment or been prescribed psychotropic medications." (Bardey Report 19.) Accordingly, this factor is neutral in the transfer analysis. *See Juvenile Male*, 554 F.3d at 469 (factor was neutral where defendant had not been enrolled in any formal treatment program).[16]

### F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserts that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law 25.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would

---

**16.** The defendant argues that this factor weighs in favor of denying the motion to transfer because the defendant has never had the opportunity to receive treatment. However, this factor requires the Court to examine *response* to treatment efforts and the nature of those efforts, and the absence of treatment leads the Court to find the factor is neutral. *See, e.g., Juvenile Male*, 554 F.3d at 469. In any event, the Court has considered the fact that defendant has not had the benefit of any opportunity for treatment, but considers him to be a poor candidate for treatment for the reasons discussed *infra*.

be available in New York State for individuals of the defendant's age. (*Id.*)

 The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Defense counsel argues that this factor should be afforded "substantial weight." (Def.'s Mem. of Law 8.) However, although the Court finds that this factor weighs against transfer, the Court finds that it does not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors, in combination, overwhelmingly favors transfer. *See Doe # 3*, 113 F.Supp.2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (citation omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. As an initial matter, the defendant is charged with an attempted murder and a murder in connection with his alleged participation in the violent activity of the MS–13 street gang. These are precisely the types of serious crimes that weigh strongly in favor of transfer.

Moreover, despite his lack of a criminal record and no indication of any past treatment efforts, a review of the record clearly demonstrates that the defendant is not likely to respond to rehabilitative efforts if he is convicted of the charged crimes and provided with juvenile rehabilitation programs. Indeed, Dr. Bardey candidly concluded that defendant is "a poor candidate for rehabilitation." (Bardey Report 22.) Furthermore, as discussed above, the fact that the defendant is already eighteen years old, considered in conjunction with the other factors, strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (citations omitted)); *J. Anthony G.*, 690 F.Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, the Court finds that the rehabilitation potential for the defendant—who "qualifies for a diagnosis of adolescent antisocial behavior" (Bardey Report 18), and is "a poor candidate for rehabilitation" (*id.* at 22)—is extremely low, and short-term rehabilitation efforts in a juvenile program are therefore very likely to be futile.[17] ·

 The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the

---

**17.** The defendant attacks Dr. Bardey's Report a number of times. (*See* Def. Mem. of

juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (citation omitted). Accordingly, given that the crimes charged here are very serious, and given that the record demonstrates that the defendant is extremely unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

### IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

Law 5, 7.) However, even without Dr. Bardey's Report, the Court would conclude that the overall balancing of the statutory factors still favors transfer, primarily because of the following: (1) the violent nature of the alleged attempted murder and murder; (2) the allegations related to the defendant's substantial participation in the violent activities of the MS–13 street gang; and (3) the defendant was sixteen years and six months old at the time of the alleged attempted murder, nearly seventeen years old at the time of the alleged murder, and is currently over eighteen years old. *See, e.g., Doe #3*, 113 F.Supp.2d at 609 (granting transfer motion even where defendant's social background, his present intellectual development, and the availability of treatment programs weighed against transfer, and defendant's psychological maturity was a neutral factor); *Doe #1*, 74 F.Supp.2d at 320–21 (transferring case even though defendant's social background, his present intellectual development and psychological maturity, his response to past treatment efforts, and the availability of treatment programs all weighed against transfer).